IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| AUBREY L.,[1] | ) | |
| | ) | |
| Plaintiff, | ) | No. 24 C 7055 |
| | ) | |
| v. | ) | Magistrate Judge Jeffrey Cole |
| | ) | |
| MARTIN J. O'MALLEY, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff applied for Disability Insurance Benefits under Title II of the Social Security Act, 42 U.S.C. §§416(I), 423, over three years ago in November 2021, alleging he became disabled on February 1, 2014 – which he later amended to April 30, 2018 (Administrative Record (R.) 109) – due to "Bipolar, Depression, Back injury, Shoulder injury, Phyc[h]osis, Episodes, Suicidal thoughts, Always tired, Migraines and headaches, Right ankle injury." (R. 184-85, 209). Over the next two years, plaintiff's application was denied at every level of administrative review: initial, reconsideration, administrative law judge (ALJ), and appeals council. It is the ALJ's decision that is before the court for review. *See* 20 C.F.R. §§ 404.955; 404.981. Plaintiff filed suit under 42 U.S.C. § 405(g) on August 9, 2024, and the parties consented to the jurisdiction of a magistrate judge pursuant to 28 U.S.C. § 636(c) on August 23, 2024. [Dkt. #7]. Plaintiff asks the court to reverse and remand the Commissioner's decision, while the Commissioner seeks an order affirming the decision.

---

[1] Northern District of Illinois Internal Operating Procedure 22 prohibits listing the full name of the Social Security applicant in an Opinion. Therefore, the plaintiff shall be listed using only their first name and the first initial of their last name.

**I.**

After an administrative hearing at which plaintiff, represented by counsel, testified, along with a vocational expert, the ALJ determined the plaintiff had the following severe impairments: bipolar disorder/schizoaffective disorder and a substance abuse disorder. (R. 25). The ALJ determined that the plaintiff did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1, specifically considering Listings 12.03 (schizophrenia) and 12.04 (depression). (R. 26). In the areas of mental functioning, the ALJ found that plaintiff had moderate limitations in understanding, remembering or applying information; in interacting with others; in concentrating, persisting or maintaining pace; and in adapting or managing oneself. (R. 26-27).

The ALJ then determined that the plaintiff had the residual functional capacity ("RFC") to capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations:

> the [plaintiff] was limited to work involving simple, routine tasks with clear expectations as to those tasks. He was limited to work involving simple work-related decisions and routine changes. The [plaintiff] was limited to work that allowed for direction/instruction from supervisors but where tasks did not require collaboration or team type tasks with coworkers and work with no interaction with the public.

(R. 27). The ALJ summarized the plaintiff's testimony and found that the plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," but that the plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." (R. 28). The ALJ then reviewed the medical record, determining that the "medical evidence does not support any additional limitations in the claimant's

residual functional capacity through his date last insured, [December 31, 2021]." (R. 29).

Next, the ALJ relied on the testimony of the vocational expert to find that the plaintiff could perform his past work as an automobile detailer. (R. 34).[2] He would also be able to perform work as a transportation cleaner (D.O.T. #919.687-014) with 56,000 jobs nationally; cleaner (D.O.T. # 381.687-018) with 30,000 jobs nationally and counter supply worker (D.O.T. # 312.687-010) with 27,000 jobs nationally. (R. 35-36). Accordingly, the ALJ concluded that the plaintiff was not disabled and not entitled to benefits under the Act. (R. 36).

## II.

The court's review of the ALJ's decision is "extremely limited." *Jarnutowski v. Kijakazi*, 48 F.4th 769, 773 (7th Cir. 2022). If the ALJ's decision is supported by substantial evidence, the court on judicial review must uphold that decision even if the court might have decided the case differently in the first instance. See 42 U.S.C. § 405(g). The substantial evidence standard is not a high hurdle to negotiate. *Biestek v. Berryhill*, – U.S. –, –, 139 S. Ct. 1148, 1154 (2019); *Baptist v. Kijakazi*, 74 F.4th 437, 441 (7th Cir. 2023); *Bakke v. Kijakazi*, 62 F.4th 1061, 1066 (7th Cir. 2023). Indeed, it may be less than a preponderance of the evidence, *Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007); *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir.2007), and is only that much "evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S.

---

[2] In a footnote, the plaintiff argues that his past work as an auto detailer is not relevant to this case per a new Social Security Ruling, SSR 24-2p. Arguments like this, presented in undeveloped fashion in a footnote, are generally deemed waived. *See Harmon v. Gordon*, 712 F.3d 1044, 1053 (7th Cir.2013); *Parker v. Franklin Cnty. Cmty. Sch. Corp*., 667 F.3d 910, 924 (7th Cir. 2012). Moreover, SSR 24-2p applies to "new applications filed on or after the applicable date of the SSR [June 22, 2024] and to claims that are pending on and after the applicable date." 2004 WL 2846571, n.1. The ALJ issued her decision on July 25, 2023 – a year before the SSR issued — and so, unless she is prescient, she had no opportunity to consider the SSR. Nor did the Appeals Council, which denied a rehearing on June 10, 2024.

389, 401 (1971); *Tutwiler v. Kijakazi*, 87 F.4th 853, 857 (7th Cir. 2023). To determine whether substantial evidence exists, the court reviews the record as a whole, but does not attempt to substitute its judgment for the ALJ's by reweighing the evidence, resolving debatable evidentiary conflicts, or determining credibility. *Crowell v. Kijakazi*, 72 F.4th 810, 814 (7th Cir. 2023); *Reynolds v. Kijakazi*, 25 F.4th 470, 473 (7th Cir. 2022); *Gedatus v. Saul*, 994 F.3d 893, 900 (7th Cir. 2021). Where reasonable minds could differ on the weight of evidence, the court defers to the ALJ. *Karr v. Saul*, 989 F.3d 508, 513 (7th Cir. 2021); *Zoch v. Saul*, 981 F.3d 597, 602 (7th Cir. 2020); *see also Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966)(". . . the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence."); *Blakley v. Comm'r Of Soc. Security*, 581 F.3d 399, 406 (6th Cir. 2009)("The substantial-evidence standard ... presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.").

But, in the Seventh Circuit, the ALJ also has an obligation to build a "logical bridge" between the evidence and the result to afford the claimant meaningful judicial review of the administrative findings. *Varga v. Colvin*, 794 F.3d 809, 813 (7th Cir. 2015); *O'Connor–Spinner v. Astrue,* 627 F.3d 614, 618 (7th Cir.2010). The court has to be able to trace the path of the ALJ's reasoning from evidence to conclusion. *Minnick v. Colvin*, 775 F.3d 929, 938 (7th Cir. 2015); *Jelinek v. Astrue*, 662 F.3d 805, 812 (7th Cir. 2011). While this requirement has been described as "lax," *Crowell*, 72 F.4th at 816; *Elder v. Astrue*, 529 F.3d 408, 415 (7th Cir. 2008); *Berger v. Astrue*, 516 F.3d 539, 545 (7th Cir. 2008), the Seventh Circuit has also explained that, even if the court agrees with the ultimate result, the case must be remanded if the ALJ fails in his or her obligation to build that "logical bridge." *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)(". . . we cannot uphold a

decision by an administrative agency, any more than we can uphold a decision by a district court, if, while there is enough evidence in the record to support the decision, the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result."); *see also Jarnutowski*, 48 F.4th at 774 (". . . the Commissioner argues, we should affirm the ALJ's decision because it was supported by the evidence. Possibly. But we cannot reach that conclusion from the ALJ's analysis."); *but see, e.g., Riley v. City of Kokomo*, 909 F.3d 182, 188 (7th Cir. 2018)("But we need not address either of those issues here because, even if [plaintiff] were correct on both counts, we may affirm on any basis appearing in the record,...."); *Steimel v. Wernert*, 823 F.3d 902, 917 (7th Cir. 2016)("We have serious reservations about this decision, which strikes us as too sweeping. Nonetheless, we may affirm on any basis that fairly appears in the record."); *Kidwell v. Eisenhauer*, 679 F.3d 957, 965 (7th Cir. 2012)("[District court] did not properly allocate the burden of proof on the causation element between the parties,...No matter, because we may affirm on any basis that appears in the record.").

Of course, this is a subjective standard, and a lack of predictability comes with it for ALJs hoping to write opinions that stand up to judicial review. One reviewer might see an expanse of deep water that can only be traversed by an engineering marvel like the Mackinac Bridge. Another might see a trickle of a creek they can hop across with barely a splash. Indeed, the Seventh Circuit's opinion in *Jarnutowski*, 48 F.4th 769, exemplifies this subjectivity. Two judges on that panel felt the ALJ had not adequately explained aspects of her reasoning while a third judge, dissenting, thought she did, as did the Magistrate Judge who had reviewed the ALJ's decision (by consent) at the district court level. *Donna J. v. Saul*, No. 19 C 2957, 2021 WL 2206160, at *8 (N.D. Ill. June 1, 2021).

Prior to *Sarchet*'s "logical bridge" language, the court generally employed the phrase "minimal articulation" in describing an ALJ's responsibility to address evidence. *Zalewski v. Heckler*, 760 F.2d 160, 166 (7th Cir. 1985)(collecting cases). The court's focus was on whether an ALJ's opinion assured the reviewing court that he or she had considered all significant evidence of disability. In *Zblewski v. Schweiker*, 732 F.2d 75 (7th Cir. 1984), for example, the court "emphasize[d] that [it] d[id] not require a written evaluation of every piece of testimony and evidence submitted" but only "a minimal level of articulation of the ALJ's assessment of the evidence...in cases in which considerable evidence is presented to counter the agency's position." *Zblewski*, 732 F.2d at 79. In *Stephens v. Heckler*, 766 F.2d 284, 287-88 (7th Cir. 1985), the court explained that the ALJ had to:

> explain why he rejects uncontradicted evidence. One inference from a silent opinion is that the ALJ did not reject the evidence but simply forgot it or thought it irrelevant. That is the reason the ALJ must mention and discuss, however briefly, uncontradicted evidence that supports the claim for benefits.

766 F.2d at 287.

More recently, the Seventh Circuit has again emphasized that all ALJs really need to do is "minimally articulate" their reasoning. *Grotts v. Kijakazi*, 27 F.4th 1273, 1276 (7th Cir. 2022); *Brown v. Colvin*, 845 F.3d 247, 252 (7th Cir. 2016). The court has explained "that social-security adjudicators are subject to only the most minimal of articulation requirements." *Warnell*, 97 F.4th at 1053; *see also Morales v. O'Malley*, 103 F.4th 469, 471 (7th Cir. May 31, 2024)(". . . ALJs are 'subject to only the most minimal of articulation requirements"—an obligation that extends no further than grounding a decision in substantial evidence."). So, as ever, "[i]f a sketchy opinion assures us that the ALJ considered the important evidence, and the opinion enables us to trace the

path of the ALJ's reasoning, the ALJ has done enough." *Stephens v. Heckler*, 766 F.2d 284, 287-88 (7th Cir. 1985). In this instance, while reasonable minds might differ as to the result, the ALJ did enough.

### III.

### A.

The plaintiff claims that he became unable to work in April 2018 when he was just twenty-seven years old. Given that his date last insured is December 31, 2021 (R. 191), it is a small window in which to establish disability. *See Mandrell v. Kijakazi*, 24 F.4th 514, 525 (7th Cir. 2022); *Parker v. Astrue*, 597 F.3d 920, 924 (7th Cir. 2010). As always, that has to be done, not with allegations, but with medical evidence. *Durham v. Kijakazi,* 53 F.4th 1089, 1096 (7th Cir. 2022); *Kaplarevic v. Kijakazi*, 3 F.4th 940, 943(7th Cir. 2021); *Gedatus*, 994 F.3d 893, 905 (7th Cir. 2021). The medical record, while 560 pages long, does not include a lot of evidence from the pertinent period. Indeed, about half of the medical record pertains to plaintiff's four-day admission to a psychiatric unit for a psychotic episode in February 2014, a few years before his alleged onset of disability in April 2018. (R. 581-840).

At that time, doctors said his issues were caused by dehydration, marijuana use, and his mental impairments (R. 587). Plaintiff's family brought him to the hospital, saying he was delusional. They explained that he had been "Moving around excessively the last two days" and "shoveling snow excessively." (R. 584). His father explained that the plaintiff and his brother moved out of the house recently and "[t]hey started partying, using drugs, but eventually . . . began having altercations . . . so the brother moved out." (R.692).

The plaintiff was admitted for aggressive hydration treatment and kidney monitoring. (R. 582, 584). He was noted to be a smoker, a drinker, and marijuana user. (R. 584). Drug screening was positive for marijuana (R. 587), and doctors' notes suggested his episode was induced by his cannabis use. (R. 705, 709). Psychiatrically, he was noted to be restless, moving around in his bed, but cooperative. (R. 585). Plaintiff reported auditory and visual hallucinations. (R. 595). Upon mental status examination, it was noted that: "Speech is normal in volume, normal in rate, and normal in rhythm. Speech production is normophonic. Associations and linkage are normal. Content is appropriate. . . . No delusional ideation or referentiality are reported or evident. . . . No hallucinations or illusions are reported or evident. . . . Attention and concentration appear intact. Fund of information is normal. Abstraction is normal. Long-term memory appears good. Short-term memory appears good. Praxic and gnostic functions appear intact. Insight/Judgment: The patient acknowledges having an illness that requires treatment." (R. 593).

There is no further record of medical treatment until March 16, 2019. At that time plaintiff's family brought him in because he "was holding his week old son for about 4 hours" and did not want to give the child back to his mother when they were ready to leave. The plaintiff reported that he had difficulty with mood swings, but denied any suicidal or homicidal ideations, or hallucinations. (R. 408). His behavior was appropriate and cooperative. (R. 411). Although he denied substance use (R. 408), he again tested positive for marijuana. (R. 412). He was discharged after a few hours with a psychiatry referral. (R. 408).

The next instance of treatment is not for another year, in February 2020, when the plaintiff sought treatment for flu-like symptoms. (R. 383, 388). His behavior was noted to be "Appropriate; Cooperative." (R. 389, 395).

Several months after that, in September 2021, plaintiff was taken for treatment after his mother called the police and reported that he was physically aggressive toward family members. (R. 290, 843). Plaintiff tested positive for cannabis once again. (R. 322, 351). Doctors' assessment was cannabis use, hyperglycemia, elevated creatine and liver function. (R. 293, 847). Upon admission, plaintiff's mood was anxious, affect was constricted, thought process was intact, insight and judgement were limited. (R. 294, 848). Plaintiff was yelling, combative, uncooperative and had to be restrained early on, but became calm and cooperative after treatment. (R. 327-29). Following that treatment, he was discharged home but declined the need for medication. (R. 294).

A couple of months after that, in December 2021, plaintiff again sought treatment for flu-like symptoms: cough, sore throat, body aches, and nasal congestion. (R. 299, 305). Covid test was positive. (R. 306). Plaintiff was said to display appropriate behavior and was alert and cooperative. (R. 306).

That is the record the ALJ was given to consider. And, the ALJ did go through it in some detail. (R. 29-30). While the plaintiff advocates for more detail, the ALJ's summarization was adequate and appropriate. *See Grotts*, 27 F.4th at 1278 ("An ALJ need not discuss every detail in the record as it relates to every factor.... Summaries of medical evidence, while definitionally 'partial and selective,' are appropriate."); *Gedatus*, 994 F.3d at 901 (7th Cir. 2021)(". . . if [plaintiff] is complaining that the ALJ summarized the medical evidence, that is unavailing because summaries are appropriate."). She did not pick and choose or ignore anything. "This is not a case where an ALJ ignored evidence contrary to h[er] conclusion." *Gedatus*, 994 F.3d at 901. Significantly, there are long gaps without treatment and gaps in treatment can underscore claimant's failure to carry his burden of proof. *Hess v. O'Malley*, 92 F.4th 671, 680 (7th Cir. 2024). There is evidence that plaintiff

9

was not following his medication regimen, and there is evidence that he was complicating his condition with regular marijuana use. (R. 536, 539, 705, 709). There simply is not a lot of evidence there to establish the plaintiff is disabled. Or, more specifically, there is not much evidence to prove he is unable to clean automobiles, which is what this case comes down to.

Moreover, the ALJ relied on the view of the evidence from two state agency reviewing psychologists – experts – who determined that, while the plaintiff had some restrictions as a result of his mental impairment, he could still perform certain types of work. (R. 94-96, 104-05). Overall, this is a case where the ALJ weighed the limited evidence one way and reached a result supported by "substantial evidence." The plaintiff, in essence, wants the court to reweigh the evidence and reach the result the plaintiff prefers; but that is not how "substantial evidence" review works. *Warnell*, 97 F.4th at 1052; *Gedatus*, 994 F.3d at 900.

**B.**

Still, the plaintiff has a number of criticisms of the ALJ's decision. He begins by taking the ALJ to task for purportedly not following the opinions from the two state agency reviewing psychologists to the letter, despite finding them "generally persuasive." The reviewing psychologists both found that the plaintiff had:

> moderate social skill deficits and displays irritability and difficulty getting along with others. He can accept direction from supervisors; however, allow for work settings involving limited sustained contact with co-workers and the public.

(R. 95,105). As the plaintiff says, the ALJ found these opinions "generally persuasive as they are well supported and generally consistent with the medical evidence . . . for the period through [plaintiff's] date last insured." (R. 33). In fashioning her residual functional capacity finding, the ALJ departed from the language of the two reviewing psychologists and limited the plaintiff "to

10

work that allowed for direction/instruction from supervisors but where tasks did not require collaboration or team type tasks with coworkers and work with no interaction with the public." (R. 27). But, while the court will likely never understand why ALJs insist on making everyone's life just a bit more difficulty by doing things like this, it's not as though the ALJ's rephrasing changed the substance of the reviewing psychologists' opinions to any significant degree.

Again, the two reviewing psychologists found that the plaintiff could tolerate "limited sustained contact with co-workers and the public." (R. 95, 105). The ALJ went a bit further in terms of the general public, ruling out any interaction instead of merely limiting interaction. Surely, the plaintiff cannot complain about that. *See Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019)("This finding was more limiting than that of any state agency doctor or psychologist, illustrating reasoned consideration given to the evidence [plaintiff] presented."); *Karla J.B. v. Saul*, No. 19 CV 50019, 2020 WL 3050220, at *4 (N.D. Ill. June 8, 2020)("Essentially, Plaintiff argues the ALJ erred by placing more—not fewer—restrictions on Plaintiff's RFC. Again, this is a quizzical argument."); *Ricky L. v. O'Malley*, No. 23 C 6006, 2024 WL 3848552, at *11-12 (N.D. Ill. Aug. 16, 2024). As for co-workers, the ALJ limited interaction by ruling out work that required collaboration or teamwork with co-workers. Such tasks would require the type of sustained contact that the reviewing psychologists said had to be "limited," meaning the ALJ's phrasing is compatible with the limitations the two psychologists found. So, with due respect to the plaintiff's briefs [Dkt. #12, at 4; #18, at 3], the court *is* able to tell how the ALJ assessed the relevant limitation and it does not appear that the ALJ left anything out.

A reviewing court is charged with reading an ALJ's opinion as a whole and taking a common-sense approach to its review. *Winsted v. Berryhill*, 923 F.3d 472, 478 (7th Cir. 2019); *Rice*

Case: 1:24-cv-07055 Document #: 20 Filed: 02/11/25 Page 12 of 20 PageID #:936

*v. Barnhart*, 384 F.3d 363, 369 (7th Cir. 2004); *Shramek v. Apfel*, 226 F.3d 809, 811 (7th Cir. 2000). From a common-sense standpoint, if a person is detailing cars on his own – that's what the job at issue is, after all – and isn't collaborating or working in teams with co-workers, the contact is going to be rather limited and not sustained. In terms of importance to the job of automobile detailer, activities like "Assisting . . . Others", "Establishing and Maintaining Relationships", "Developing and Building Teams", "Resolving Conflict or Negotiating with Others" barely rate at all. https://occupationalinfo.org/onet/98905.html.

But, the plaintiff vaguely argues that the ALJ had to come up with some sort of "temporal limitation on contact with co-workers." [Dkt. #12, at 4; #18, at 2]. One can only guess what the plaintiff is looking for here. At one point, the plaintiff refers to "durationally accommodating with co-workers" [Dkt. #12, at 4], so perhaps the plaintiff is envisioning a set number of hours or minutes? But, the state agency reviewers provided no such limitation in terms of minutes or hours, so any such limitation from the ALJ would have been speculation. Guessing or speculating isn't good enough; it's up to the plaintiff to show how his medically determinable impairments caused any limitations beyond those the ALJ found. *Gedatus*, 994 F.3d at 905; *see also Jozefyk v. Berryhill*, 923 F.3d 492, 498 (7th Cir. 2019) ("[E]ven if the ALJ's RFC assessment were flawed, any error was harmless" because "[i]t is unclear what kinds of work restrictions might address [claimant's] limitations ... because he hypothesizes none" and "the medical record does not support any."). The plaintiff doesn't even suggest any "temporal limitation" or "durational[] accommodati[on]" in terms of hours.

From there, the plaintiff also argues that the ALJ failed to accommodate numerous moderate limitations the state agency reviewing psychologists found. The two psychologists agreed that

12

plaintiff had moderate limitations in maintaining attention and concentration for extended periods, sustaining an ordinary routine without special supervision, interacting appropriately with the general public, accepting instructions and responding appropriately to criticism from supervisors, getting along with coworkers or peers without distracting them or exhibiting behavioral extremes, and setting realistic goals or making plans independently of others. [Dkt. #12, at 6-7, citing (R. 92-96, 104-05)]. But, as the plaintiff concedes, these individual assessments led to – formed the basis of -- the psychologists' final assessment. As already explained, the ALJ adequately accommodated the limitations set out in the psychologists' final assessment.

A more careful reading of the psychologists' assessments and the ALJ's RFC shows that the ALJ's RFC adequately addressed the limitations underlying the psychologists' final assessment. One cannot ignore that a "moderate" limitation in an area means that the individual still has a fair ability in that area. *Pavlicek v. Saul*, 994 F.3d 777, 783 (7th Cir. 2021). It doesn't mean – as the plaintiff seems to suggest – bad or inadequate. *Pavlicek*, 994 F.3d at 783. So, for example, a fair ability in maintaining attention and concentration for extended periods, or a fair ability in sustaining an ordinary routine without special supervision could certainly be accommodated by a limitation to "work involving simple, routine tasks with clear expectations as to those tasks", "work involving simple work-related decisions and routine changes", and "work that allowed for direction/instruction from supervisors but where tasks did not require collaboration or team type tasks with coworkers and work with no interaction with the public." Overall, the ALJ reasonably relied on the two psychologists' final narrative assessments because they were "in fact consistent with the 'moderate' checklist ratings. *Pavlicek*, 994 F.3d at 783; *see also Varga v. Colvin*, 794 F.3d 809, 816 (7th Cir. 2015)(". . . an ALJ may rely on a doctor's narrative RFC, rather than the checkboxes, where that

narrative adequately encapsulates and translates those worksheet observations."); *but see DeCamp v. Berryhill*, 916 F.3d 671, 676 (7th Cir. 2019) ("... even if an ALJ may rely on a narrative explanation, the ALJ still must adequately account for limitations identified elsewhere in the record, including specific questions raised in check-box sections of standardized forms....").

Perhaps sensing that this tack would go nowhere, the plaintiff next does a 180 and argues that the ALJ ought to have ignored the state agency doctors' opinions because the evidence they reviewed supported limitations in excess of those included in the RFC. [Dkt. #12, at 8]. Arguing first one way, and then the opposite way, tends to give a brief an air of uncertainty, if not desperation. But, more importantly, contending that the state agency doctors got it wrong is just another way of asking the court to reweigh the evidence. And, again, that's not how this works. For example, do two instances of treatment for "bizarre behavior" or "agitated bizarre behavior" brought on by daily marijuana use over the course of several years dictate a finding of disability? Not necessarily. Does a "solemn and somber" mood disqualify someone from washing cars? It would not seem to, and the plaintiff makes no attempt to explain how it does. The fact that there is more than one way to look at a record like this – that reasonable minds might differ over the result – shows why a court is not permitted to reweigh evidence on substantial evidence review. *See, e.g., Chavez v. O'Malley*, 96 F.4th 1016, 10121 (7th Cir. 2024); *Tutwiler*, 87 F.4th 853, 859 (7th Cir. 2023).

### C.

Next, the plaintiff complains that the ALJ wrongfully rejected the opinion from his counselor that he was, essentially, completely disabled. Ms. Moss filled out a form plaintiff's counsel provided on April 21, 2023. (R. 527-532). As the ALJ suggested, these types of forms are not ideal. *See, e.g., Trottier v. Saul*, 809 F. App'x 326, 327 (7th Cir. 2020)(criticizing doctor's opinion expressed by

14

checking boxes rather than explaining how medical evidence supported his conclusions); *Urbanek v. Saul*, 796 F. App'x 910, 915 (7th Cir. 2019)(questioning persuasive value of a checklist opinion); *Varga v. Colvin*, 794 F.3d 809, 816 (7th Cir. 2015)(checklist observations are ... "less useful to an ALJ" than a doctor's narrative summary). They are leading questions, in written form. For example, plaintiff submits that Ms. Moss "identified" some 30 symptoms that plaintiff was exhibiting. But, that's not exactly right. Plaintiff's counsel listed about 40 symptoms, and Ms. Moss checked off about 30 of them.

In any event, the counselor first saw the plaintiff in July 2022. (R. 531-32). As the ALJ pointed out, this was several months after the expiration of plaintiff's insured status. While plaintiff's condition is chronic, Ms. Moss cannot speak to plaintiff's symptoms in 2018, or even in 2021. And, indeed, she does not attempt to. She fills out plaintiff's counsel's form in the "present tense." Does that mean Ms. Moss's observations are irrelevant? No, but obviously, the ALJ was not wrong to favor the opinions from psychologists who reviewed the medical evidence from the pertinent period. There is no indication that Ms. Moss reviewed any of the evidence from plaintiff's treatment in February 2014 to his treatment in September 2021.

Moving on from the nature of the checkbox form and its timing, the most important factors in evaluating any medical opinion are supportability and consistency. 20 C.F.R. § 404.1520c(a)–(c); *Albert v. Kijakazi*, 34 F.4th 611, 614 (7th Cir. 2022). The ALJ adequately explained that Ms. Moss's assessment was not consistent with the medical evidence and medical opinions from the pertinent period. (R.32-33). She also adequately explained that Ms. Moss's assessment was not supported by treatment notes. (R. 32-33). As already explained, "ALJs are "subject to only the most minimal of articulation requirements—an obligation that extends no further than grounding a decision in

15

substantial evidence." *Morales*, 103 F.4th at 471; *Warnell*, 97 F.4th at 1053. Here, the ALJ's reasoning was adequate and was supported by substantial evidence on both consistency and supportability.

First, there's consistency, or lack thereof. It's difficult not to see the gulf between Ms. Moss's July 2023 assessment and the medical evidence from the pertinent period. Ms. Moss put a dot in the "no useful ability to function" box for fifteen out of the sixteen "work-related activities" the plaintiff's attorney's form set out. The only activity she thought plaintiff could perform at all was "remember work-like procedures," and she put a dot in the "seriously limited" box for that one. This what some might cynically call a "dead claimant RFC." *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009); *Thelmarae W. v. Saul*, 476 F. Supp. 3d 717, 728–29 (N.D. Ill. 2020); *Farley v. Berryhill*, 314 F. Supp. 3d 941, 948 (N.D. Ill. 2018); *West v. Colvin*, 2013 WL 3728807, at *14 (N.D. Ill. 2013). In other words, it's a terribly dire assessment, and it very obviously conflicts with the assessments of the state agency reviewing psychologists. It also seems to conflict with evidence that plaintiff was working in 2015-2019 (and in 2021 and 2022, albeit very briefly) (R.55-58), despite his impairment. Even the plaintiff's short stints at Checkers or as a Lyft driver tend to undermine Ms. Moss's verdict of "no useful ability to function."

Then, there's supportability. Supportability "means that ALJs should give more weight to medical opinions with more internal explanation and support than to those without." *Bakke*, 62 F.4th at 1068. As the plaintiff tacitly concedes [Dkt. #12, at 12], Ms. Moss provided no internal support for her opinions on the plaintiff's abilities. But, more importantly, as the ALJ said, Ms. Moss's dire opinions don't even jibe with assessments early on in plaintiff's treatment at the facility where he saw Ms. Moss.

16

In July 2022, it was noted that plaintiff's symptoms were depression, anxiety, substance use, psychosis, anger control, impulsivity and sleep. He was described as having a "strong and stable outlook on his life [and] . . . a well defined cultural identity and is connected to others who would support him. [He was] well integrated in his community." (R. 570). The following month, it was noted that plaintiff was not taking his medication and that he reported some symptoms – depression, racing thoughts, anxiety – but said his activities of daily living were good. He could focus and concentrate on tasks although he could easily be distracted. He denied irritability or delusions. The doctor noted his attention was good, speech rhythm was normal, and comprehension was insightful. (R. 567-68). Upon mental status examination, plaintiff's mood was calm; affect was in normal range; speech, language, and thought process were normal; thought content was average; insight and judgment were fair; recent and remote memory were intact. (R. 486).

Remarkably, the plaintiff goes so far as to argue that the court has to overturn the ALJ's opinion because she failed to explain "why such findings outweighed relevant mood abnormalities in the record . . . ." [Dkt. #12, at 13]. But, isn't it obvious? Assessments like "calm", "normal" and "fair" are diametrically opposed to assessments like "no useful ability to function." The ALJ said as much; she didn't need to adhere to some "rigid rule of artificial completeness." *Warnell*, 97 F.4th at 1051. It seems the plaintiff's strategy here is to simply ignore the contrasts between Ms. Moss' "dead plaintiff RFC" and unremarkable exam findings and hope for the best. But, like an ALJ, a plaintiff can't just ignore the record; he has to grapple with it. *Morales*, 103 F. 4th at 471. Plaintiff fails to do that here.

**D.**

Finally, the plaintiff argues that the ALJ's assessment of his allegations regarding his symptoms – and of his mother's statement – was improper because the ALJ found that the plaintiff's ability to perform daily activities – doing a variety of household chores, shopping in stores, utilizing public transportation, and panhandling regularly to obtain money for his daily marijuana use and other expenses – undermined his claims of complete disability. [Dkt. #12, at 13-14]. But, it's more of a nitpick than an argument as it focuses on just one of the reasons the ALJ provided for her assessment of plaintiff's allegations. The plaintiff's burden here is a heavy one; he has to show that the ALJ's assessment of his allegations was "patently wrong" which means that the decision "lacks any explanation or support." *Hess v. O'Malley*, 92 F.4th 671, 679 (7th Cir. 2024); *Murphy v. Colvin*, 759 F.3d 811, 816 (7th Cir. 2014). Plaintiff falls far short of that mark here because his argument completely ignores the fact that the ALJ also said that the severity of plaintiff's allegations was not supported by the medical evidence, or by plaintiff's lack of treatment and non-compliance with his medication regimen, including continued daily use of marijuana despite medical advice against it. (R. 33-34). Plaintiff fails to develop a challenge to these other reasons, so any he might have made are waived, *Milhem v. Kijakazi*, 52 F.4th 688, 693 (7th Cir. 2022); *Jeske v. Saul*, 955 F.3d 583, 597 (7th Cir. 2020); *Shramek v. Apfel*, 226 F.3d 809, 811 (7th Cir. 2000); *Krell v. Saul*, 931 F.3d 582, 587n.1 (7th Cir. 2019); *Hall v. Berryhill*, 906 F.3d 640, 644 (7th Cir. 2018), and we have to uphold the ALJ's assessment. *See Tutwiler*, 87 F.4th at 859 ("Although the ALJ might have erred in his analysis of some factors, enough of them had adequate supporting evidence for this court to uphold his credibility determination."); *Bates v. Colvin*, 736 F.3d 1093, 1098 (7th Cir. 2013) (upholding ALJ's credibility determination despite disagreeing with some underlying reasons for that decision);

*see also Schrank v. Saul*, 843 F. App'x 786, 789 (7th Cir. 2021)(". . . we would not reverse the credibility determination as long as the ALJ provided at least one reason to support the finding."); *Halsell v. Astrue*, 357 F. App'x 717, 722–23 (7th Cir. 2009) ("Not all of the ALJ's reasons must be valid as long as enough of them are.").

Even if the ALJ's only reason for rejecting the plaintiff's and his mother's statements were plaintiff's daily activities, the plaintiff still doesn't negotiate the patently wrong bar. According to the plaintiff, the ALJ equated his daily activities with work [Dkt. #12, at 14 ("The ALJ essentially stated that even though Mr. Locke stated he could not work, he could nevertheless perform these daily activities, so they must be one and the same.")]. While the Seventh Circuit has cautioned ALJs not to equate household chores and errands with the rigorous demands of the workplace, *see, e.g., Hill v. Colvin*, 807 F.3d 862, 869 (7th Cir. 2015); *Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012); *Spiva v. Astrue*, 628 F.3d 346, 352 (7th Cir. 2010), that is not what the ALJ did here. The ALJ noted that the plaintiff claimed his symptoms were so very severe that he was unable to do any kind of work. But, yet, as the ALJ noted, he was able to perform a number of activities on a regular basis, including daily panhandling to get money for his daily marijuana use. The ALJ did not say such activities proved the plaintiff could work, or were the same as work; she just said that they undermined the claim regarding the severity of his allegations as essentially incapacitating. *See, e.g., Hahn v. Kijakazi*, No. 22-1106, 2022 WL 6628832, at *3 (7th Cir. Oct. 11, 2022); *Deborah M. v. Saul*, 994 F.3d 785, 791 (7th Cir. 2021).

## CONCLUSION

For the foregoing reasons, the plaintiff's Social Security motion [Dkt. #12] is denied, and the defendant's motion for summary judgment [Dkt. #15] is granted.

**ENTERED:** _____
UNITED STATES MAGISTRATE JUDGE

**DATE:** 2/11/25